HARRY J. JOHNSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 2415-77.
United States Tax Court
T.C. Memo 1979-7; 1979 Tax Ct. Memo LEXIS 523; 38 T.C.M. (CCH) 17; T.C.M. (RIA) 79007; January 3, 1979, Filed *523 Petitioner's wholly owned corporation distributed funds to petitioner pursuant to bona fide loan transactions. Held, such distributions do not constitute dividend income to petitioner. Held further, amounts distributed to a second corporation and petitioner's son had no demonstrable business purpose and are, therefore, found to be constructive dividends. George V. Fisher, for the petitioner. Donald W. Mosser, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on January 4, 1977, issued a statutory notice in which he determined deficiencies in petitioner's Federal *524 income taxes as follows: Taxable Year Ended
Amount
Dec. 31, 1972
$ 12,229.31
Dec. 31, 1973
23,245.00
The sole issue for our determination is whether certain distributions made by Johnson Mechanical Contractors, Inc. constitute dividend income to petitioner under sections 301 and 316, I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulations of fact, together with exhibits attached thereto, are incorporated herein by this reference. Petitioner, Harry J. Johnson, resided in Coshocton, Ohio, at the time of filing the petition herein. He filed his individual Federal income tax returns for his calendar years 1972 and 1973 with the internal revenue service center, Covington, Kentucky. Johnson Mechanical Contractors, Inc. (hereinafter JMC) was incorporated by petitioner under the laws of the state of Ohio on July 30, 1969. JMC's principal business activity since incorporation has been plumbing and heating construction. For several years prior to JMC's formation, petitioner operated the heating and plumbing construction business as a sole proprietorship. *525 Since incorporation petitioner has at all times been JMC's president and the sole shareholder of its $ 25,000 of common stock. Petitioner also owned all the stock of Central Dodge, Inc. (hereinafter Dodge), which operated a Chrysler dealership in Coshocton. Dodge had elected to be taxed under subchapter S of the Internal Revenue Code during the years 1972 and 1973. During the last 6 months of 1972 and all of 1973, petitioner owned and operated a sole proprietorship, CoshoctonFirestone (hereinafter Firestone), whose principal business activity was the sale at retail of tires and automobile accessories. During these years petitioner's son, Harry J. Johnson, Jr. (hereinafter Harry), operated a Harley-Davidson agency in Coshocton. Petitioner also formed another proprietorship, known as H. J. Johnson Enterprises, to develop certain real estate for the purpose of leasing buildings to JMC, Dodge, and his son's Harley-Davidson agency. The buildings were all adjacent to each other. Some of the loans in issue were made to petitioner in his name and some in the name of H. J. Johnson Enterprises. Since the distinction has no tax consequences in the context of this case, we will refer *526 to such loans as being made to petitioner. Petitioner generally dealt with Coshocton National Bank. He borrowed approximately $ 200,000 from the bank in 1972 to cover the cost of constructing the Dodge and Harley-Davidson buildings. However later in 1972, when he found he had underestimated his needs, the bank refused a further extension of credit, advising him that he was over-extended. He then turned to JMC to borrow the necessary funds. During this period he also built the Firestone building. In 1973 petitioner borrowed between $ 40,000-$ 60,000 from the bank but was again refused additional sums. The construction of the new buildings benefited the businesses for which they were built and created business for JMC. It not only did all the plumbing, heating, air conditioning and wiring in conjunction with the construction but continues to service these buildings. For its taxable years ended December 31, 1972 and 1973 JMC filed Federal income tax returns on the accrual method of accounting. These returns reflected a net profit of $ 20,171 and $ 31,909 for the taxable years 1972 and 1973, respectively, and loans to stockholders of $ 58,769 and $ 95,408, respectively. The *527 balance in its unappropriated retained earnings accounts for such years was $ 90,887 and $ 122,796, [1] respectively. JMC paid cash dividends for the taxable years 1971 through 1973 totaling$ 50 per year. During 1972 petitioner made the following direct withdrawals from the corporation, all of which were charged to his loan account: Date
Amount
January 31 $ 900
February 29
15,000
June 30
4,200
July 31
1,100
September 30
4,500
November 30
1,500
December 31
9,000
$ 36,200
On April 30, 1972 and May 30, 1972 the respective amounts of $ 5,634.22 and $ 1,500 were withdrawn from JMC and paid to Harry. Thus, the net amount debited during 1972 was $ 30,634.22. These withdrawals were debited to the notes receivable account. On March 31, 1972 petitioner made a $ 12,700 cash payment to JMC which was credited to that account. During 1973 JMC made the following disbursements which were charged on the books to petitioner's notes receivable account: Date
Amount
January 31
$ 12,865.41
February 28
15,340.13
March 31
1,357.73
May 31
5,000.00
June 30
6,460.00
July 31
1,217.50
October 30 $ 7,261.38
November 30
10,439.50
December 30
1,000.00
December 30
18,167.61
December 30
1,000.00
December 30
5,000.00
December 30
25,248.95
$ 110,358.21
*528 Of this amount a total of $ 5,693 represents withdrawals for Harry, a total of $ 27,044 represents disbursements to or for Dodge, and the $ 25,248.95 debited December 31, 1973 represents an ordinary trade account transaction resulting from work performed in the ordinary course of business by JMC for Firestone. The entries (other than one of the $ 1,000 entries) made November 30 and December 30 represent transactions that took place during the year that the bookkeeper improperly recorded and which the newly hired certified public accountant, John Daum (hereinafter Daum), corrected by journal entry at the end of the year. On April 30, 1973 petitioner made a $ 5,000 cash payment to JMC which was credited to his notes receivable account. On December 30, 1973 JMC entered various credits totaling $ 31,400.50 to petitioner's notes receivable account on the JMC books. The following list reflects the amount of each credit and the explanation therefor provided on such books: Explanation
Amount
Accrued payroll to Harry J. Johnson
$ 13,600.00
Accrued payroll to Harry J. Johnson
4,400.00
Accrued rent to Harry J. Johnson
3,833.00
Accrued rent to Harry J. Johnson
7,200.00
(No explanation provided)
1,217.50
(No explanation provided)
150.00
(No explanation provided)
1,000.00
$ 31,400.50
*529 Petitioner included the amount credited to his notes receivable account as accrued payroll in his income tax return and all applicable taxes were withheld and reported on W-2 forms. The accrued rent was also properly reported on petitioner's return for 1973. On December 31 of the respective years JMC's books and records reflected the following debit balances in its notes receivable accounts: Year
Balance
1971
$ 28,500.00
1972
59,134.22
1973
133,092.01
For 1973 the balance was further broken down on the corporate records to the nearest dollar as follows: Name
Amount
Petitioner
$ 95,408.00
Dodge
30,044.00
Harry
7,640.00
$ 133,092.00
For the years 1972 and 1973 JMC did not accrue and petitioner did not pay any interest or pledge any security on the amounts withdrawn by him and charged to his notes receivable account. At all relevant times the withdrawals by petitioner or disbursements to petitioner were carried by JMC on its books as notes receivable and were reflected on its financial statement and income tax returns. In 1974, before respondent's agent began his examination and raised the issues herein, interest was accrued *530 and paid by petitioner on the loan and JMC included said interest in its income. From the time JMC was formed a certified public accountant, until his death in 1973, took care of the company books. Petitioner believed that the accountant's health had been failing and, during 1972, noticed that the record keeping was becoming inadequate. However, petitioner was reluctant to change accountants because he had been performing satisfactorily up to that time. In December of 1973 JMC hired a new certified public accountant, Daum, who recommended procedural changes with respect to corporate loans. Daum discovered that the records were not up-to-date. For example, Federal income tax returns and Ohio returns for 1971 and 1972 had not been filed and 1972 accrued rent owed to petitioner had never been paid. Credit extended by JMC had been recorded on the books as loans in a notes receivable account. It had been treated on past returns as loans. Some of the loans were documented by between 12 and 20 cognovit notes bearing interest at either 5 or 6 percent. Daum recommended consolidation of the total amount outstanding as notes receivable into one note per borrower and an increase *531 in the interest rate to 8 percent. His recommendation was followed. He also recommended an increase in petitioner's 1973 rate of compensation from $ 18,000 to between $ 30,000 and $ 40,000 and that the difference be credited to his notes receivable account, along with the rent due from JMC to petitioner. Respondent determined that $ 30,634 and $ 48,709 of the amounts charged to the notes receivable account on JMC's books for the taxable years 1972 and 1973, respectively, constituted dividend income under sections 301 and 316. Such amounts are the net debits to notes receivable including withdrawals on behalf of Harry and Dodge but excluding the $ 25,248.95 debited December 31, 1973 for an ordinary trade transaction. [2]
*532 OPINION JMC has, by various means, transferred funds to petitioner or his sole proprietorship H. J. Johnson Enterprises, a wholly owned corporation, Dodge, and his son. Distributions made by a corporation for the personal benefit of a shareholder may result in constructive dividends to that shareholder. Challenge Manufacturing Co.,37 T.C. 650, 663 (1962). With respect to these transfers petitioner must satisfy a subjective test: whether the intent of the parties at the time of the transfer was primarily to benefit the shareholder. Ross Glove Co. v. Commissioner,60 T.C. 569, 595 (1973). Objective factors considered when the taxpayer's subjective intent must be determined are: (1) whether the corporation is closely held and controlled; (2) the corporation's history with respect to dividends; (3) the availability of earnings and profits from which the corporation could pay dividends; (4) whether the transfer was documented by notes or an assignment of security; (5) the payment or accrual of interest; (6) whether transfers are made in proportion to stockholdings; *533 (7) how the transferred funds are used; (8) how the transfer is treated on the books and records of the corporation and shareholder; (9) whether the shareholder had a plan and means for repayment; and (10) the history of repayment. Berthold v. Commissioner,404 F.2d 119, 121 (6th Cir. 1968); Pierce v. Commissioner,61 T.C. 424, 431 (1974). The first three factors militate against petitioner's contention that such transfers constituted loans. JMC is a corporation wholly owned and controlled by petitioner. Further, it had unappropriated retained earnings of $ 90,887 and $ 122,796 in 1972 and 1973, respectively, and yet paid dividends totaling only $ 50 in each of those years. The next three factors could support a decision for either party. Because petitioner was JMC's sole shareholder any distribution could be deemed proportionate to his stockholdings. The transfers were unsecured and JMC failed to accrue interest, but they were for the most part documented by notes. However, the immediate corrections in prior sloppy bookkeeping habits following the hiring of a new certified public accountant in December of 1973 indicate that JMC had always *534 considered the transfers to constitute loans. Further, the petitioner, a credible witness, so testified. The review and corrections of such documentation by the certified public accountant was at JMC's and petitioner's instigation. We are impressed by the fact that these adjustments were made promptly following the demise of a failing accountant and the employment of a new accountant, and that the adjustments were made prior to the instigation of respondent's audit. The final four factors must be considered separately with respect to each of the three transferees. The transfers to petitioner were made to cover petitioner's business needs as H. J. Johnson Enterprises when the local bank refused to lend the substantial additional sums necessary to the completion of buildings for Firestone, Dodge and Harley-Davidson. JMC was installing the plumbing, heating, air conditioning and wiring in conjunction with the construction of this triad of buildings and fully expected to continue to provide service therefor. These transfers appeared on the corporate books and records and tax returns as notes receivable to shareholder. They appeared as an asset on the corporate financial statements *535 and a liability on those of H. J. Johnson Enterprises. Petitioner had the ability to repay these amounts. He fully expected and planned to repay the corporation and did so whenever the funds were available. That he did so, in major part, by means of book transfers crediting accrued salary and rent due him by JMC to his notes receivable account does not negate the fact that such amounts were owed petitioner and were properly reported by him on his tax return. We note that petitioner did not make personal nonbusiness use of the loans. Based on all the facts and circumstances discussed herein we find that the intent of the parties at the time of the transfers with respect to amounts transferred to petitioner was to create a bona fide debt on the part of petitioner. Therefore, such distributions do not result in constructive dividends. On the other hand, petitioner has failed to elucidate business reasons behind the extensions of credit by JMC to Dodge and Harry. In contrast to funds lent to petitioner who therewith engaged in construction which produced revenue for JMC with respect to both installation and service contracts for plumbing, heating, air conditioning and wiring, *536 there is no evidence on the record of benefits JMC received from the extensions of credit to Dodge and Harry. Specifically, there is no evidence with respect to how much income JMC received from Dodge and Harry for servicing the installed equipment. Although the financial statements of JMC, Dodge and Harry reflect such transfers as debt, the Federal and state tax returns of JMC do not specify the existence of loans to Harry and Dodge. No evidence of payment of interest or principal on these amounts appears in the record with respect to Dodge. When amounts stipulated as borrowed by Harry are compared to the stipulated 1973 end of the year balance, it appears that some adjustment has been made. However, we are uncertain from the record whether the decrease is merely due to correcting entries or whether Harry made a repayment. Payments to brother-sister corporations and family members by a wholly owned corporation may constitute dividends to a shareholder of the latter corporation if such payments are made for personal reasons rather than for ordinary and necessary business expenses of that corporation. Hardin v. United States,461 F.2d 865, 872 (5th Cir. 1972); *537 Sammons v. Commissioner,472 F.2d 449, 451 (5th Cir. 1972); affg. on this issue T.C. Memo. 1971-145. Petitioner has failed to carry his burden of proof with respect to the transfers to Dodge and Harry. We find that such transfers resulted in constructive dividends to him. Decision will be entered under Rule 155.
Footnotes
1. The parties stipulted this figure. However, the return for 1973 reflects unappropriated retained earnings of $ 122,746.↩
2. ↩
1972
Debits: Petitioner's direct withdrawals
$ 36,200.00
Withdrawn and paid to petitioner's son
5,634.22
Withdrawn and paid to petitioner's son
1,500.00
Total Debits
$ 43,334.22
Less: Credits
Petitioner's cash payment
12,700.00
Net amount debited
$ 30,634.22
1973
Debits: Total disbursements debited to account
$ 110,358.21
Less: Credits
Book entries, December 30 $ 31,400.50
Petitioner's cash payment 5,000.00
36,400.50
Net amount debited
$ 73,957.71
Less: Ordinary trade account
25,248.95
Net amount debited less trade account
$ 48,708.76